*Clyde Campbell v. State of Maryland*, No. 1103, September Term, 2016. Opinion by Woodward, J.

**CRIMINAL PROCEDURE – SIXTH AMENDMENT – RIGHT TO A PUBLIC TRIAL – DE MINIMUS CLOSURE**

A courtroom closure in which defendant's family was excluded from the courtroom for a total time of three to three and a half hours, encompassing a portion of *voir dire* and the entire selection and swearing-in of the jury, was not a *de minimus* closure, and therefore implicated defendant's Sixth Amendment right to a public trial.

**CRIMINAL PROCEDURE – SIXTH AMENDMENT – RIGHT TO A PUBLIC TRIAL – DE MINIMUS CLOSURE – APPLICATION OF *KELLY V. STATE* TEST**

The Court applied the three-factor test articulated in *Kelly v. State*, looking to: "[1] the length of the closure, [2] the significance of the proceedings that took place while the courtroom was closed, and [3] the scope of the closure, *i.e.*, whether it was a total or partial closure." 195 Md. App. 403, 421-22 (2010), *cert. denied*, 417 Md. 502, *cert. denied*, 563 U.S. 947 (2011). On the first factor, the Court determined that the closure here, encompassing three to three and a half hours, was distinguishable from the two to three hour closure found to be *de minimus* in *Kelly* and was more analogous to a closure of an entire morning of proceedings found not to be *de minimus* in *Watters v. State*, 328 Md. 38 (1992), *cert. denied*, 507 U.S. 1024 (1993). Therefore, the first factor weighed against a finding that the closure was *de minimus*. On the second factor, the Court stated that the observation of jury selection and the swearing-in of members of the jury by members of the defendant's family (1) instills public confidence in the integrity and fairness of the criminal justice system, (2) ensures the proper use of peremptory challenges by the prosecutor under *Batson*, (3) safeguards a person accused of a crime against the arbitrary exercise of power by a prosecutor or judge, (4) allows the jurors to see that there are interested persons present, (5) permits members of a defendant's family to contribute their knowledge and insight on which jurors to select, and (6) impresses on each juror the importance of the solemn duty that he or she is assuming. Therefore, the fact that defendant's family was excluded from the entirety of the jury selection and swearing-in caused the second factor to weigh heavily against a finding that the closure was *de minimus*. On the third factor, the Court noted that the record is silent as to whether the entire public or merely appellant's family was excluded. The Court declined to adopt a *per se* rule that such a silent record implies a total or partial closure, and ruled that this factor was therefore neutral.

**CRIMINAL PROCEDURE – SIXTH AMENDMENT – RIGHT TO A PUBLIC TRIAL – JUSTIFIED CLOSURE**

Where the trial court failed to consider any alternatives to closing the courtroom, the

closure was not justified under the four-factor test articulated in *Waller v. Georgia*, 467 U.S. 39 (1984), and the reviewing court need not consider the additional factors identified in *Waller*.

**CRIMINAL PROCEDURE – FIFTH AMENDMENT – VOLUNTARY AND KNOWING WAIVER OF MIRANDA RIGHTS**

Whether or not a criminal suspect was expressly informed of all possible topics of questioning is not relevant to determining whether the suspect voluntarily and knowingly waived his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966).

Circuit Court for Baltimore County
Case No. 03-K-14-004633

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1103

September Term, 2016

_____

CLYDE CAMPBELL
v.
STATE OF MARYLAND

_____

Nazarian,
Friedman,
*Woodward,

JJ.

_____

Opinion by Woodward, J.

_____

Filed: March 29, 2019

*Woodward, Patrick L., J., now retired, participated in the hearing of this case while an active member of this Court, and as its Chief Judge; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and the preparation of this opinion.

**Wright, J., did not participate in the Court's decision to designate this opinion for publication pursuant to Md. Rule 8-605.1.

Pursuant to Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

On April 19, 2016, a jury sitting in the Circuit Court for Baltimore County convicted appellant, Clyde Campbell, of second degree murder. The court subsequently sentenced appellant to thirty years of incarceration. In this timely appeal, appellant presents two questions for our review, which we have reordered and rephrased as follows:[1]

> 1. Did the circuit court violate appellant's Sixth Amendment right to a public trial when the court excluded appellant's family members during a portion of *voir dire*, the entire selection of the jury,[2] and the swearing-in of the members of the jury?
>
> 2. Did the circuit court err in denying appellant's motion to suppress his statements?

Because we conclude that the circuit court erred by excluding appellant's family members from the courtroom during a portion of *voir dire*, the entire selection of the jury, and the swearing-in of the members of the jury, we reverse appellant's conviction and remand the case for a new trial. Accordingly, we need not reach the second question on appeal, but in the interest of judicial economy we will briefly address one of appellant's challenges to the admissibility of his statements to the police.

---

[1] Appellant's questions as presented in his brief are as follows:

> 1. Did the trial court err in denying Appellant's motion to suppress his statements?
>
> 2. Did the trial court err in closing the courtroom to Appellant's family during jury selection?

[2] For purposes of this appeal, the selection of the jury is the process by which the prosecutor and defense counsel use their peremptory challenges to choose the twelve members of the jury and any alternates. *See* Md. Rule 4-312(f), (g).

## BACKGROUND

Evidence produced during the trial showed that appellant and his son, Jesse Campbell, lived with appellant's long-term girlfriend, Dorothy Grubb, in her row house in Baltimore County. Jesse's recollection of the night of July 24, 2014, was that appellant and Grubb got into an argument in the upstairs bathroom of Grubb's house and such argument did not cease until Jesse heard a "big bang." The commotion at the house also caught the attention of two next-door neighbors, who called 911 reporting suspected child abuse.

Officer Frederick Johnson responded to Grubb's house around 11:30 p.m. and knocked at the front door in an attempt to contact any occupants. Appellant refused to open the door, yelled obscenities, and eventually, turned off all interior lights. In an effort to investigate who else may be inside the home, Officer Johnson then went to the back of the house and discovered two individuals in an alley. When Officer Johnson identified himself, the two individuals began to run. Once the individuals were detained, they were identified as appellant and Jesse. After questioning the pair, the police let them return home, because the call to police had been about suspected child abuse and Jesse appeared unharmed. The police did not enter Grubb's house and were told by appellant that Grubb left to stay with a friend.

Later that night, Jesse observed appellant drive his truck to the back of the house. Jesse saw appellant place in the back of his truck a large tarp that appeared to have something "long and big" in it, and then drive away.

2

The next day, appellant asked Jesse if he wanted to go camping, and Jesse agreed. According to Jesse, the trip was not previously planned, and when they discovered that there were no available campsites, the two ended up driving to Ocean City. While on this trip, Jesse noticed that the tarp he saw on the night of July 24, 2014, was no longer in the back of appellant's truck, and the truck was "clear mostly."

While appellant and Jesse were on their trip, Grubb's daughter, Kristi Grubb, was unable to contact her mother. Kristi had gone to her mother's house on July 26, 2014, to pick her up to go swimming, but Grubb did not come to the door. Later that day, Kristi filed a missing person report, and based on that missing person's report, Detective Ryan Massey "obtained a search and seizure warrant for" Grubb's house on July 27, 2014. The search of the house did not reveal the location of Grubb, but police did discover blood stains inside and outside the home.

On July 28, 2014, appellant called 911 at 3:44 a.m. to inform police that he would come down to the police station to discuss "Grubb being missing." Later that morning, police arrested appellant on an arrest warrant unrelated to Grubb's disappearance. Around 8:30 a.m., the police placed appellant in an interrogation room at police headquarters. At approximately 9:54 a.m., Detective Massey entered the room and began to advise appellant of his *Miranda* rights. After being advised of his rights, appellant signed a form indicating that he wished to waive those rights. Appellant then spoke to detectives.

On July 29, 2014, detectives from the homicide unit in Baltimore County conducted a search for Grubb, focusing on areas close to her house. In a wooded area near a highway "within two, two and a half miles" of Grubb's house, Detective Massey and Detective

3

Craig Schrott discovered Grubb's remains wrapped in a blue tarp. The next day, Mary Jane Ripple, M.D., the deputy chief medical examiner for Maryland, determined that the cause of Grubb's death was "multiple injuries [including] sharp and blunt force injuries[,]" and the manner of death was homicide.

Upon receiving the results of the autopsy, Detective Massey instructed Detective Schrott and Detective Joe Caskey to bring appellant to headquarters to inform him that he would be charged with the murder of Grubb. During transport, appellant inquired about Grubb, and made several other statements.

Shortly after appellant arrived at headquarters on the afternoon of July 30, 2014, Detective Massey informed appellant that police had found Grubb's body. Detective Massey then told appellant that the autopsy determined that her death was a homicide, and he would be charged with Grubb's murder. Upon appellant's inquiry as to why he was being charged with Grubb's murder, Detective Massey explained that some of the evidence indicated that appellant was responsible for her death. In response, appellant proclaimed that Grubb's death was an accident and that she had fallen in the upstairs bathroom. Appellant was later indicted for the murder of Grubb.

Before trial, appellant filed several motions, including a motion to suppress all statements that he made to law enforcement. After a motions hearing on February 19, 2016, the circuit court denied appellant's motion to suppress.

On April 11, 2016, appellant's trial began with the *voir dire* of prospective jurors. In the afternoon session of the first day, the State brought to the court's attention that one of the jurors told the prosecutors that appellant's family was sitting in the jury box and

4

asked whether that was permitted. The trial judge declined to address the issue at that time, and the *voir dire* continued until 6:31 p.m. that evening.

The next day, the *voir dire* recommenced at 9:38 a.m. Shortly thereafter, the clerk informed the trial judge that appellant's son[3] wished to watch the proceedings, which prompted the following discussion:

> [PROSECUTOR 1]: No, Your Honor. State's going to move to exclude [appellant's] son, sister, any other relatives from the courtroom today.
>
> THE COURT: And the people that we're talking about now, they're not listed as witnesses?
>
> [PROSECUTOR 1]: They're not. They're not witnesses.
>
> [DEFENSE COUNSEL 1]: **[Appellant] would oppose that. He's entitled to a fair and public trial, and that includes his family who are not witnesses being allowed to be in the courtroom for him as emotional support. Sometimes we accommodate that if there's no space, but there's clearly space at this point in the courtroom**; so I mean, I think they're entitled to come in if they want to. They can't disrupt. They can't communicate with people. They just have to sit there.
>
> [PROSECUTOR 1]: Your Honor.
>
> THE COURT: Let me hear from the state.
>
> [PROSECUTOR 1]: Thank you. Two things. First, [appellant's sister] who was present yesterday - - and I'm not sure if she's here today - - is going to be heard at the - - during the trial although she will not be called to testify.
>
> There was a jail[] recording that Your Honor has already ruled admissible, and she is part of that conversation. **Secondly, there is some evidence that they were fraternizing with the jury panel**

---

[3] We can infer that this son was not Jesse, because the prosecutor stated that this son was not a witness and Jesse was a key witness in the case against appellant.

**because one of the jurors mentioned to [prosecutors 1 and 2] yesterday that she was aware that family members of [appellant] were seated in the jury box.**

[DEFENSE COUNSEL 1]: So the state brought that to our attention yesterday and I said to - - **[defense counsels 1 and 2] talked to them yesterday at the end of the day about it** because obviously we don't want to see a problem with that, either. And we said how do you think it is that that was the case?

And they said because the deputy walked over to us and was talking to us, and we weren't wearing jury badges, so that's why they thought they were - - that's why they thought they were. **They said they didn't talk to anybody.**

**They didn't communicate with anybody and candidly them sitting there without the jurors or somebody coming in and saying that they did anything inappropriate, it wouldn't be appropriate to exclude them based on the fact that some excused juror surmised that they were the family because that's a logical inference.**

THE COURT: All right. I hear what you're saying. Anything else from the state on that?

[PROSECUTOR 2]: Your Honor, I did speak with [the] deputy and go over to them and that was before - - like that was the juror came to us before the deputy walked over and talked to them that information. **I mean, without knowing exactly what was said or why that juror said that, the juror came over to us.** We didn't have any indication that anybody said we can't talk to you, **but that's all she said to us.**

[PROSECUTOR 1]: **We actually in response to her statement said please tell the judge's clerk, but she didn't. She exited the courtroom.**

THE COURT: I'm going to grant - - **I'm going to grant the state's request that they in this part of the case which is going through continuing the [*voir dire*] process**, I want to make sure that there is absolutely nothing that can be considered by the people who are here and the people who are coming back at 1:00 that there are any, any possible issue that can be raised with that.

6

I also take into account that for whatever reason, one of the prospective jurors yesterday thought, brought to my attention that the process was intimidating. **I don't know if it was intimidating for - - again I don't want to speculate, but perhaps it could even be because individuals in the courtroom - - I'll just put it that way and whatever** - - it's amazing what people observe that we don't necessarily know. During this part, I'm making sure that we do everything right, and **I think it's not going to be taking anything away from [appellant's] defense that his family members not take part in this phase of the trial.**

[DEFENSE COUNSEL 1]: [Appellant] notes an objection.

THE COURT: It's noted and your record is made.

(Emphasis added).

The circuit court continued the *voir dire* until breaking for lunch at 11:48 a.m. At 1:27 p.m., the court reconvened, and the clerk conducted a roll call of all the jurors. At the conclusion of the *voir dire* but before beginning the process of selecting the jury, the court allowed both parties to make any objections for the record. Defense counsel objected to the court's ruling that excluded appellant's family members from the courtroom:

[DEFENSE COUNSEL 1]: So and then [appellant] would also just readopt his argument about the exclusion of his family during the jury selection process arguing that there's not a substantial basis for the [c]ourt to make a finding that they should be excluded and that [appellant] had an objection based upon that just adopting what we had previously discussed. Court's indulgence. That's all, Judge.

THE COURT: Anything from the state?

[PROSECUTOR 2]: No, Your Honor.

[PROSECUTOR 1]: No, Your Honor.

THE COURT:

* * *

7

Now, counsel, **I'm looking at** defense - - excuse me - - **state's attorneys at this point. Is your position the same with respect to [appellant's] family members during the striking process?**

[PROSECUTOR 1]: Yes, Your Honor.

[DEFENSE COUNSEL 1]: Same objection, Judge.

THE COURT: And your objection. All right. Then my ruling will be consistent with respect to the striking of the jury. The family will be permitted - - first of all, **we have a packed courtroom here. Since we don't have anybody sitting in the jury box or in the row, front row folding chairs in front of the jury box, I think that's a factor that needs to be considered by the [c]ourt,** and I'm going to be consistent and not have them in the courtroom for the striking of the jury. **They will be permitted to be part of any and all other proceedings that follow from this which would essentially be opening statement forward.**

(Emphasis added).

The parties then proceeded to select the jury by using their respective peremptory challenges. This process concluded at 2:48 p.m., and defense counsel objected to the jury panel so selected on the grounds that, *inter alia*, the circuit court forbade appellant's family from being present during the *voir dire* and jury selection process. The jury was duly sworn, and the court took a short recess.

After returning from the recess at 3:03 p.m., the circuit court heard other preliminary motions, and opening statements were made by the parties. Although it is not clear from the record, members of appellant's family were apparently permitted in the courtroom at this time. At 5:09 p.m., the court recessed for the day.

Appellant's trial continued until April 19, 2016, when the jury convicted him of second degree murder. On July 22, 2016, the circuit court sentenced appellant to thirty

8

years of incarceration, which was later affirmed by a three-judge sentence review panel.

This timely appeal followed.

## DISCUSSION

### I. Courtroom Closure

In *In re Oliver*, 333 U.S. 257 (1948) the United States Supreme Court traced the

origins of the right to a public trial provided by the Sixth Amendment of the United States

Constitution:

> This nation's accepted practice of guaranteeing a public trial to an accused has its roots in our English common law heritage. The exact date of its origin is obscure, but it likely evolved long before the settlement of our land as an accompaniment of the ancient institution of jury trial. In this country the guarantee to an accused of the right to a public trial first appeared in a state constitution in 1776. Following the ratification in 1791 of the Federal Constitution's Sixth Amendment, which commands that 'In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial * * *' most of the original states and those subsequently admitted to the Union adopted similar constitutional provisions. . . .
>
> The traditional Anglo-American distrust for secret trials has been variously ascribed to the notorious use of this practice by the Spanish Inquisition, to the excesses of the English Court of Star Chamber, and to the French monarchy's abuse of the lettre de cachet. All of these institutions obviously symbolized a menace to liberty. In the hands of despotic groups each of them had become an instrument for the suppression of political and religious heresies in ruthless disregard of the right of an accused to a fair trial. Whatever other benefits the guarantee to an accused that his trial be conducted in public may confer upon our society, the guarantee has always been recognized as a safeguard against any attempt to employ our courts as instruments of persecution. The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power.

*Id.* at 266-70 (footnotes omitted).  "[A] public trial [has also been determined to, among

other things,] encourage[] witnesses to come forward and discourage[] perjury." *Waller v. Georgia*, 467 U.S. 39, 46 (1984); *Longus v. State*, 416 Md. 433, 445 (2010). Because a public trial is a constitutional guarantee that is essential to the "framework of any criminal trial[,]" the Supreme Court has deemed a violation of this right to be a structural error that requires "automatic reversal" when properly preserved and raised on direct appeal. *See Weaver v. Massachusetts*, 137 S.Ct. 1899, 1907-10 (2017) (internal quotation marks omitted).

The Sixth Amendment right to a public trial, however, is not absolute, and as the Supreme Court has stated,

> there are exceptions to this general rule. "[T]he right to an open trial may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information." *Waller*, 467 U.S., at 45, 104 S.Ct. 2210. "Such circumstances will be rare, however, and the balance of interests must be struck with special care." *Ibid.* *Waller* provided standards for courts to apply before excluding the public from any stage of a criminal trial:
> [1] "[T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, [2] the closure must be no broader than necessary to protect that interest, [3] the trial court must consider reasonable alternatives to closing the proceeding, and [4] it must make findings adequate to support the closure." *Id.*, at 48, 104 S.Ct. 2210.

*Presley v. Georgia*, 558 U.S. 209, 213-14 (2010) (some alterations in original). Stated otherwise, the exclusion of the public from any stage of a criminal trial may be justified under the Sixth Amendment only if the above four-factor test in *Waller* has been satisfied.

Many state and lower federal courts, however, have not reached the issue of a closure's justification when the closure was "too trivial" to constitute a violation of the

Sixth Amendment right to a public trial. *See Gibbons v. Savage*, 555 F.3d 112, 121 (2d Cir. 2009) (exclusion of defendant's mother from courtroom during afternoon of first day of jury selection was too trivial to violate right to public trial), *cert. denied*, 558 U.S. 932; *Peterson v. Williams*, 85 F.3d 39, 41, 44 (2d Cir. 1996) (twenty minute closure while defendant testified was "too trivial" to constitute Sixth Amendment violation), *cert. denied*, 519 U.S. 878; *People v. Bui*, 183 Cal. App. 4th 675, 686-87, 689 (Cal. Ct. App. 2010) (exclusion of three people for forty minutes during *voir dire* was *de minimus*). "A triviality standard is different from a harmless error standard; it looks to whether the closure implicated the protections and values of the Sixth Amendment." *Kelly v. State*, 195 Md. App. 403, 420 (2010), *cert. denied*, 417 Md. 502, *cert. denied*, 563 U.S. 947 (2011).

Known as the *de minimus* doctrine, the Court of Appeals of Maryland first acknowledged the same in *Watters v. State*, 328 Md. 38, 49 (1992) ("Although we agree with the State that not every technical violation of the Sixth Amendment right of open trial requires a new proceeding or trial, we would be hard pressed to declare a violation of this magnitude *de minimus*, or otherwise not of constitutional significance."), *cert. denied*, 507 U.S. 1024 (1993). Later, in *Kelly*, this Court established that in determining whether a closure is *de minimus*, an appellate court must weigh the following factors: "[1] the length of the closure, [2] the significance of the proceedings that took place while the courtroom was closed, and [3] the scope of the closure, *i.e.*, whether it was a total or partial closure." 195 Md. App. at 421-22.

In sum, when an appellate court is called upon to determine whether an appellant's Sixth Amendment right to a public trial has been violated, the court must first determine

11

whether the closure was *de minimus*, and thus does not implicate the Sixth Amendment right to a public trial by weighing the three factors set forth in *Kelly*.  If the closure was not *de minimus*, the court proceeds to the four-factor test set forth in *Waller* to determine whether such closure was justified.  If the closure was not justified, the error is structural, and the appellant is entitled to a new trial.

## A. *De minimus* closure

It is clear that the Sixth Amendment right to a public trial extends to the *voir dire* of prospective jurors, the selection of the jury, and the swearing-in of the members of the jury. *See Presley*, 558 U.S. at 212-13; *Watters*, 328 Md. at 49; *Kelly*, 195 Md. App. at 418. Because the State argues that the exclusion of appellant's family from a portion of the *voir dire* and the entire selection and swearing-in of the jury was *de minimus*, we shall begin by examining the *de minimus* doctrine in Maryland and its applicability to the instant appeal.

As mentioned above, the Court of Appeals in *Watters*, 328 Md. at 49, first acknowledged that a closure could be *de minimus* and thus not implicate the Sixth Amendment right to a public trial.  In *Watters*, "[w]ithout the knowledge or consent of the trial judge or the parties, a deputy sheriff excluded the public, including members of [Watters's] family and possibly representatives of the press, from the courtroom during [*voir dire*] and jury selection[.]" *Id.* at 42.  Defense counsel discovered that the courtroom had been closed to members of the public including Watters's family members during a lunch recess, which took place after the selection of the jury. *Id.* at 42.  Defense counsel promptly moved for a mistrial on the grounds that Watters's Sixth Amendment right to a public trial had been violated. *Id.*

12

A hearing on the issue revealed that the deputy sheriff closed the courtroom "'[b]ecause of the nature of the number of people involved in the case and the courtroom would not handle all the persons who wanted to get into the courtroom.'" *Id.* (alteration in original). "The deputy [sheriff] admitted . . . that there were 'some seats' available [in the courtroom], but he could not estimate how many." *Id.* Watters's mother also testified that she was denied admittance at 9:30 a.m. and was only admitted after the lunch break at 1:30 p.m. *Id.* at 43. The trial court concluded that the closure was done for security purposes, and therefore, denied the motion for a mistrial. *Id.* After Watters's conviction and appeal to this Court, we affirmed the judgment of the circuit court, prompting Watters to file a petition for *certiorari*, which the Court of Appeals granted. *Id.* at 41.

The Court of Appeals stated that, "although [the] 'benefits of a public trial are frequently intangible, difficult to prove, or a matter of chance, the Framers plainly thought them nonetheless real.'" *Id.* at 47 (quoting *Waller*, 467 U.S. at 49, n.9). The Court noted that there were harms in addition to "the inability of the public to judge for itself and to reinforce by its presence the fairness of the process," such as "the inability of [Watters's] family to contribute their knowledge or insight to the jury selection and the inability of the venirepersons to see the interested individuals." *Id.* at 48. The Court held that the closure violated Watters's right to a public trial, explaining:

> **The scope of the closure in this case was substantial.** The courtroom was open only to court personnel, the venirepersons, and witnesses. All other members of the public, including members of [Watters'] family and the press, were barred. **The closure extended over a significant period of time—an entire morning of trial during which the [*voir dire*] and selection and swearing of the jury were accomplished. Although we agree with the State that**

13

> **not every technical violation of the Sixth Amendment right of open trial requires a new proceeding or trial, we would be hard pressed to declare a violation of this magnitude *de minimus*, or otherwise not of constitutional significance.** We conclude that this violation of [Watters's] Sixth Amendment right carries with it the presumption of specific prejudice mandated by *Waller*, and thus requires the granting of appropriate relief. Under the particular facts of this case, that relief is necessarily the granting of a new trial.

*Id.* at 49 (emphasis added).

Eighteen years later, in *Kelly*, we determined, for the first time, that a closure of a trial was *de minimus* and thus did not implicate the appellant's Sixth Amendment right to a public trial. 195 Md. App. at 428. In *Kelly*, the first day of trial began at approximately 10:12 a.m. *Id.* at 412. Because of the small size of the courtroom, the prospective jurors filled every seat and some were standing. *Id.* at 413. At approximately 2:05 p.m. and "[a]fter completing the strikes of prospective jurors for cause," Kelly's counsel moved for a mistrial on the grounds that the sheriff prohibited Kelly's father from being in the courtroom during the *voir dire* process. *Id.* at 413-14. The circuit court questioned the sheriff about the exclusion of Kelly's father, and the sheriff informed the court that family members were excluded due to the limited space in the courtroom. *Id.* at 415. The court preliminarily denied the motion for a mistrial and the selection of the jury began. *Id.*

After selecting the jury,[4] the circuit court revisited Kelly's motion for a mistrial and denied the motion. *Id.* The court reasoned that the family may have been excluded by the sheriff during the morning session of *voir dire* but that did not mean that they were prohibited from attending the afternoon session, which included the selection of the jury.

---

[4] It is unclear whether the jury had been sworn at this time.

14

*Id.* at 416. Moreover, the court explained that "[d]uring the entire [*voir dire*], we did not have enough seats for all of the jurors. We had a couple of jurors who were standing throughout the whole thing . . . ." *Id.* at 415.

On appeal to this Court, we first looked to the *de minimus* doctrine as articulated by the Court of Appeals in *Watters*. *Id.* at 420-21. With the aid of case law from our sister states and the federal courts, we were able to identify three factors that are involved in the determination of whether a courtroom closure was *de minimus*. *Id.* at 421-22. We held a closure could be *de minimus* if the following three factors weighed favorably toward a closure that did not impinge upon the values embodied in the Sixth Amendment: "[1] the length of the closure, [2] the significance of the proceedings that took place while the courtroom was closed, and [3] the scope of the closure, *i.e.*, whether it was a total or partial closure." *Id.*

As to the first factor, "the length of the closure," this Court stated that such factor was significant but not dispositive. *Id.* at 422. In looking to other jurisdictions, we ascertained that the shorter the length of time, the more likely that this factor weighed in favor of a *de minimus* closure. *Id.* at 423-24. In *Kelly*, the court closure was for two to three hours during the morning of *voir dire*. *Id.* at 427. We recognized that "[t]his amount of time is not extensive, but it clearly is not inconsequential, and it falls within the time frame in which courts have reached conflicting results." *Id.* Thus we believed it necessary to look to the other two factors to resolve the *de minimus* issue. *Id.*

On the factor of the significance of the proceeding, this Court found instructive *Gibbons v. Savage*, 555 F.3d 112, 121 (2d Cir. 2009), *cert. denied*, 558 U.S. 932. *Kelly*,

15

195 Md. App. at 424. In *Gibbons*, the Second Circuit held that the exclusion of appellant's mother from the first day of *voir dire* was *de minimus*, because "nothing of significance" occurred while the appellant's mother was excluded from the courtroom. *Id.* at 425 (internal quotation marks and citation omitted). The Second Circuit's reasoning was as follows:

> **Even if the trial judge had not excluded Gibbons's mother from the courtroom, she would not have been able to watch a significant portion of what occurred during that afternoon session because the private interviews of individual jurors** as to their reasons for inability to serve **were justifiably conducted in an adjacent room out of the hearing and sight of the other jurors.** Further, nothing of significance happened during the part of the session that took place in the courtroom. The judge read the indictment, asked questions of a few jurors, and provided administrative details on what the jurors should expect if chosen. **No prospective jurors were excused except with the consent of both parties. No peremptory challenges were made, and no objections were asserted by either party to anything that occurred. The next morning, when voir dire resumed, Gibbons's mother was allowed to watch the proceedings.**

*Id.* (quoting *Gibbons*, 555 F.3d at 121) (emphasis added).

As in *Gibbons*, Kelly's family was prohibited from attending the morning session of the *voir dire*. *Id.* at 426. Kelly's family thus was excluded during a proceeding that "involved questioning of individual jurors at the bench, a procedure that typically cannot be heard by spectators in the courtroom." *Id.* at 426. Unlike *Watters*, the circuit court did not exclude Kelly's family from the jury selection process. *Id.* at 427. Therefore, we held that the nature of the proceeding weighed in favor of finding the closure *de minimus*. *Id.* at 428-29.

16

In considering the last factor - whether the closure "was a total or partial closure[,]" - this Court determined that the closure was a partial closure, unlike the total closure in *Watters*. *Id.* at 428. We based our determination on the trial court's uncontradicted, on the record finding that the general public was not excluded from the proceedings. *Id.* at 428, n.13. We concluded that, because the closure was a partial closure, this factor weighed in favor of the closure being *de minimus*. *Id.* at 428.

In holding that the closure was *de minimus*, this Court stated:

> [T]he closure here was *de minimus* and did not implicate [Kelly's] Sixth Amendment constitutional right to a public trial. In reaching this conclusion, we consider as significant: (1) the limited duration of the closure, two to three hours during [*voir dire*]; (2) that the closure did not encompass the entire proceedings of [*voir dire*] and jury selection, and that a significant portion of the proceedings during that time were not even audible to spectators in the courtroom; and (3) that the closure was a partial one, and not a total exclusion of all spectators. Because there was no violation of [Kelly's] right to a public trial, the trial court did not err in denying [Kelly's] motion for a mistrial.

*Id.* at 428-29.

### 1. *Analysis*

The State argues on appeal that *Kelly* controls this case and disposes of appellant's Sixth Amendment argument. According to the State, the first factor is analogous to *Kelly*, because the closure lasted only approximately three hours. As to the second factor, the State argues that, because the closure "did not occur during the evidentiary phase of trial when the Sixth Amendment's concern for responsible participant behavior and openness to potential new witnesses is at its most acute[,]" the proceeding is more analogous to the *voir dire* proceeding in *Kelly*. Lastly, the State contends that, because the record is silent

17

on whether any other members of the public were excluded, it logically follows that no other members of the public were excluded from the proceedings, and thus the closure was a partial closure. For the reasons set forth below, we disagree.

a. Factor One: Length of the Closure

In the case *sub judice*, appellant's family was excluded shortly after the start of *voir dire* sometime after 9:38 a.m. on the second day of trial, and the family was not allowed to observe the court proceedings until after 3:03 p.m. When we take into account that from 11:48 p.m. to 1:27 p.m. and from 2:48 p.m. to 3:03 p.m., the court was not conducting any proceedings, the length of the closure was still between three and three and one-half hours. The record further reveals that the circuit court recessed at 5:09 p.m. that day, and thus appellant's family, at best, would have only been able to observe about two hours of appellant's trial.

A closure of *at least* three hours in the case *sub judice*, is distinguishable from *Kelly*'s "two to three hour[]" courtroom closure. *Kelly*, 195 Md. App. at 428. Although such factual distinction is admittedly marginal, it is our view that appellant's courtroom closure is more analogous to the closure of an entire morning as in *Watters*. 328 Md. at 43. As explained *infra,* the proceedings that occurred in appellant's case were of such significance that a lengthy closure, such as at least three hours, weighs against a determination of a *de minimus* closure. *See Kelly*, 195 Md. App. at 428 (indicating the significance of the length of the closure is viewed in light of the significance of the proceedings that occurred during that closure by stating "(1) the limited duration of the closure, two to three hours during *voir dire*") (emphasis added).

18

b. Factor Two: Significance of the Proceedings

The exclusion of appellant's family during a portion of *voir dire* and the entire selection and swearing-in of the jury is the most significant fact that distinguishes the case *sub judice* from *Kelly*. As explained *supra*, Kelly's family members were only excluded during *voir dire*, which was a fact on which we heavily relied to distinguish *Kelly* from *Watters*. *Id*. at 427. We wrote that "unlike in *Watters*, [the closure in *Kelly*] did not extend to the actual *selection of the jury*." *Id.* at 428 (emphasis added). Moreover, unlike *Kelly*, the selection and swearing-in of the jury in appellant's case was not a process conducted at the bench where spectators would not have been able to observe or overhear the parties and prospective jurors. *Cf. id.* at 427-28. Instead, the parties used their peremptory challenges to select the jury, and the selected jury members were subsequently sworn in in a proceeding that would have been observable to spectators in the courtroom. Accordingly, the proceedings in appellant's case are analogous to *Watters*, where the courtroom closure occurred over a period "during which the [*voir dire*] and selection and swearing of the jury were accomplished." This factor therefore weighs against a determination that appellant's courtroom closure was *de minimus*. *See Watters*, 328 Md. at 49.

Because the *Watters* Court did not analyze the significance of the proceedings that took place while the courtroom was closed, we shall take the opportunity to examine the historical and procedural significance of selecting a jury and swearing-in of the jury members occurring in open court.

### i. *Significance of Jury Selection in Public*

The United States Supreme Court's examination of jury selection revealed the following:

> [A]fter the Norman Conquest, [ ] the jury came to be but a small segment representing the community, the obligation of all freeman to attend criminal trials was relaxed; however, **the public character of the proceedings, including jury selection, remained unchanged.** Later, during the fourteenth and fifteenth centuries, the jury became an impartial trier of facts, owing in large part to a development in that period, allowing challenges. 1 W. Holdsworth, A History of English Law 332, 335 (7th ed. 1956). **Since then, the accused has generally enjoyed the right to challenge jurors in open court at the outset of the trial.**
>
> Although there appear to be few contemporary accounts of the process of jury selection of that day, one early record written in 1565 places the trial "[i]n the towne house, or in some open or common place." T. Smith, De Republica Anglorum 96 (Alston ed. 1906). Smith explained that "there is nothing put in writing but the enditement":
>
>> "All the rest is doone openlie in the presence of the Judges, the Justices, the enquest, the prisoner, *and so many as will or can come so neare as to heare it*, and all depositions and witnesses given aloude, *that all men may heare from the mouth of the depositors and witnesses what is saide.*" *Id.,* at 101 (emphasis added).
>
> **If we accept this account it appears that beginning in the sixteenth century, jurors were selected in public.**
>
> As the trial began, the judge and the accused were present. Before calling jurors, the judge "telleth the cause of their comming, *and* [thereby] *giveth a good lesson to the people.*" *Id.* at 96-97 (emphasis added). **The indictment was then read; if the accused pleaded not guilty, the jurors were called forward, one by one, at which time the defendant was allowed to make his challenges.** *Id.,* at 98. Smith makes clear that the entire trial proceeded "openly, that not only the xii [12 jurors], but the Judges, the parties *and as many* [others] *as be present may heare.*" *Id.,* at 79 (emphasis added).

20

**This open process gave assurance to those not attending trials that others were able to observe the proceedings and enhanced public confidence.** The presence of bystanders served yet another purpose according to Blackstone. If challenges kept a sufficient number of qualified jurors from appearing at the trial, "either party may pray a *tales*."[5] 3 W. Blackstone, *supra*, at 364; see also M. Hale, The History of the Common Law of England 342 (6th ed. 1820). A "tales" was the balance necessary to supply the deficiency.

**The presumptive openness of the jury selection process in England, not surprisingly, carried over into proceedings in colonial America.** For example, several accounts noted the need for talesmen at the trials of Thomas Preston and William Wemms, two of the British soldiers who were charged with murder after the so-called Boston Massacre in 1770. **Public jury selection thus was the common practice in America when the Constitution was adopted.**

*Press-Enterprise Co. v. Superior Court of Cal., Riverside, Cty.*, 464 U.S. 501, 506-08

(1984) (italics in original) (bold emphasis added) (footnotes omitted).

The Supreme Court also explored the significance of the use of peremptory

challenges in jury selection in *Swain v. Alabama*, 380 U.S. 202 (1965). Although *Batson*

*v. Kentucky*, 476 U.S. 79, 95 (1986), eventually overturned *Swain*, the Supreme Court's

historical background is still informative:

The peremptory challenge has very old credentials.

\* \* \*

---

[5] The Supreme Court explained that tales was the process in which the judge would

award a [writ of] "*tales de circumstantibus*, of the persons present in court, to be joined to the other jurors to try the cause." If the judge issued such writ, the sheriff brought forward "talesmen" from among the bystanders in the courtroom. These talesmen were then subject to the same challenges as the others.

*Press-Enterprise Co.*, 464 U.S. at 507 n.6 (internal citation omitted).

21

[English] common law provided the starting point for peremptories in this country. In the federal system, Congress early took a part of the subject in hand in establishing that the defendant was entitled to 35 peremptories in trials for treason and 20 in trials for other felonies specified in the 1790 Act as punishable by death, 1 Stat. 119 (1790). In regard to trials for other offenses without the 1790 statute, both the defendant and the Government were thought to have a right of peremptory challenge, although the source of this right was not wholly clear. In 1865, the Government was given by statute five peremptory challenges in capital and treason cases, the defendant being entitled to 20, and two in other cases where the right of the defendant to challenge then existed, he being entitled to 10. 13 Stat. 500 (1865). Subsequent enactments increased the number of challenges the Government could exercise, the Government now having an equal number with the defendant in capital cases, and six in cases where the crime is punishable by more than one year's imprisonment, the defendant or defendants having ten.

The course in the States apparently paralleled that in the federal system. The defendant's right of challenge was early conferred by statute, the number often corresponding to the English practice, the prosecution was thought to have retained the Crown's common-law right to stand aside, and by 1870, most, if not all, States had enacted statutes conferring on the prosecution a substantial number of peremptory challenges, the number generally being at least half, but often equal to, the number had by the defendant.

\* \* \*

In contrast to the course in England, where both peremptory challenge and challenge for cause have fallen into disuse, **peremptories were and are freely used and relied upon in this country, perhaps because juries here are drawn from a greater cross-section of a heterogeneous society**. . . . **The persistence of peremptories and their extensive use demonstrate the long and widely held belief that peremptory challenge is a necessary part of trial by jury.** See Lewis v. United States, 146 U.S. 370, 376, 13 S.Ct. 136, 138, 36 L.Ed. 1011**. Although '(t)here is nothing in the Constitution of the United States which requires the Congress (or the States) to grant peremptory challenges,'** Stilson v. United States, 250 U.S. 583, 586, 40 S.Ct. 28, 30, 63 L.Ed. 1154, **nonetheless the challenge is 'one of the most important of the rights secured to the accused,'** Pointer v. United States, 151 U.S.

> 396, 408, 14 S.Ct. 410, 414, 38 L.Ed. 208. The denial or impairment of the right is reversible error without a showing of prejudice, Lewis v. United States, supra; Harrison v. United States, 163 U.S. 140, 16 S.Ct. 961, 41 L.Ed. 104; cf. Gulf, Colorado & Santa Fe R. Co. v. Shane, 157 U.S. 348, 15 S.Ct. 641, 39 L.Ed. 727. '(F)or it is, as Blackstone says, an arbitrary and capricious right, and it must be exercised with full freedom, or it fails of its full purpose.' Lewis v. United States, 146 U.S., at 378, 13 S.Ct., at 139.
>
> The function of the challenge is not only to eliminate extremes of partiality on both sides, but to assure the parties that the jurors before whom they try the case will decide on the basis of the evidence placed before them, and not otherwise. In this way the peremptory satisfies the rule that 'to perform its high function in the best way 'justice must satisfy the appearance of justice.'' In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942.

*Swain*, 380 U.S. at 212, 214-16, 218-19 (emphasis added) (footnotes omitted).

In our view, the importance of the selection of the jury in open court is further highlighted by *Batson* and its progeny, which prohibits prosecutors and defense attorneys from using a peremptory challenge to strike a juror based on race, ethnicity, or gender. *See Batson*, 476 U.S. at 89; *Hernandez v. New York*, 500 U.S. 352, 369 (1991) (plurality opinion) (suggesting that peremptory challenges based on ethnicity are prohibited); *Georgia v. McCollum*, 505 U.S. 42, 49-50 (1992) (prohibiting the use of discriminatory peremptory challenges by the defense or prosecution); *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 130-31 (1994) (prohibiting peremptory challenges based on gender). Such prohibition has been held not only to "safeguard[] a person accused of crime against the arbitrary exercise of power by prosecutor[s] or judge[s,]" but to advance "public confidence in the integrity of the criminal justice system." *See Batson*, 476 U.S. at 86; *McCollum*, 505 U.S. at 48-50. It is because "[t]he petit jury has occupied a central position

23

in our system of justice" that the above safeguards are in place, and the public, including members of an accused family, ensure the preservation of these safeguards through the ability to openly observe court proceedings. *See Batson*, 476 U.S. at 86-88; *In re Oliver*, 333 U.S. at 270.

A defendant's family, like appellant's family in the instant case, has an interest in observing the prosecutor employ his or her peremptory challenges to ensure compliance with *Batson* and to serve as a deterrent from any "arbitrary exercise of power." *See, e.g.*, *In re Oliver*, 333 U.S. at 270 ("The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power."). Having family members present during the selection of the jury also allows jurors to see that there are interested parties present and allows "the defendant's family to contribute their knowledge and insight" on which jurors to select. *Cf. Watters*, 328 Md. at 48 ("Along with the general detriments associated with a closed trial, notably the inability of the public to judge for itself and to reinforce by its presence the fairness of the process, the present case demonstrates other kinds of harms: the inability of the defendant's family to contribute their knowledge or insight to the jury selection and the inability of the venirepersons to see the interested individuals.").

Members of the public at large also have an interest in observing jury selection to ensure that all parties are complying with *Batson*, because "[j]ust as public confidence in criminal justice is undermined by a conviction … where discrimination has occurred in jury selection, so is public confidence undermined where a defendant, assisted by . . . discriminatory peremptory strikes, obtains an acquittal." *McCollum*, 505 U.S. at 50; *see*

24

*also Press-Enterprise Co.*, 464 U.S. at 509 ("public proceedings vindicate the concerns of the victims and the community in knowing that offenders are being brought to account for their criminal conduct by jurors fairly and openly selected"). Therefore, the public observation of jury selection furthers the Sixth Amendment's purpose to "enhance[] both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the [judicial] system." *See Press-Enterprise Co.*, 464 U.S. at 508.

### ii. *Significance of the Public Swearing-in of the Jury*

As to the significance of the swearing-in of the jury, this Court wrote:

> "From its earliest institution, the jury was formally sworn to declare the truth as between parties[.]" 1 Francis X. Busch, *Law and Tactics in Jury Trials* 9 (Encycl. ed.1959).
>
> * * *
>
> Although historically established by legislation, today, Maryland's requirement that a jury be sworn is found in the Maryland Rules: "The jurors and any alternates to be impaneled shall be called from the qualified jurors remaining on the list in the order previously designated by the court and shall be sworn." Md. Rule 4-312(h).[6]

*Alston v. State*, 177 Md. App. 1, 18-19 (2007) (footnote omitted), *aff'd*, 414 Md. 92 (2010).

We expressed the following opinion on "the purpose and benefits of the oath" administered to the jury:

> The solemnity of calling the juror before the prisoner, in the presence of the court, and his there taking the solemn oath prescribed by law to well and truly try and true deliverance make of that prisoner, **not**

_____

[6] Maryland Rule 4-312(h) is now Rule 4-312(g)(1) and reads: "Impaneling. The individuals to be impaneled as sworn jurors, including any alternates, shall be called from the qualified jurors remaining on the jury list in the order previously designated by the trial judge and shall be sworn."

25

> **only gives the prisoner a comfortable assurance that he is to have a fair and impartial trial, but has a salutary tendency to prepare the mind of the juror for the solemn duty he is assuming.** We think the jury should be sworn in each case.

*Id.* at 21 (quoting *Slaughter v. Georgia*, 28 S.E. 159 (Ga. 1897)) (emphasis in original). We, therefore, determined that "[t]he swearing of the jury has been recognized as an *integral step* in the conduct of a criminal trial." *Id.* at 19 (emphasis added). We further held that the failure to swear the jury is a structural error "akin to [a] violation of the public trial guarantee addressed in *Waller v. Georgia*[.]" *Id.* at. 25.

In our view, the swearing-in of a jury in an open proceeding with interested parties present impresses on jurors the importance of "the solemn duty he [or she] is assuming[,]" *see id.* at 21, and promotes the public's confidence that jurors under oath will "pay attention to the evidence, observe the credibility and demeanor of the witnesses and conduct themselves at all times, as befits one holding such an important position." *See id.* at 20 (quoting *Michigan v. Pribble*, 249 N.W.2d 363, 366 (Mich. Ct. App. 1976). Therefore, we conclude that the swearing-in of the jury in open court furthers the purpose of the Sixth Amendment: "'that the public may see [that the accused] is fairly dealt with . . . and that the presence of interested spectators *may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions*.'" *See In re Oliver*, 333 U.S. at 270 n.25 (quoting Cooley, Constitutional Limitations (8th ed. 1927) at 647) (emphasis added).

### iii. *Significance of the Proceedings in the Case Sub Judice*

The above examination confirms that the selection and swearing-in of the jury are vital proceedings in our judicial system. Trial proceedings with such historical

26

underpinnings that are integral to our criminal justice system should ordinarily be readily observable by the public. *See Watters*, 328 Md. at 49 (holding it significant that a closure occurred during the selection and swearing-in of the jury). Because appellant's family was excluded from the selection and swearing-in of the jury, we hold that this factor weighs *heavily* against concluding that the closure in the instant case was *de minimus*.

### c. Factor Three: Scope of the Closure

Although it is undisputed that appellant's family was excluded from the *voir dire* on the morning of the trial's second day and the entire selection and swearing-in of the jury, the record is silent as to the presence of members of the public during these proceedings. We decline the State's invitation to adopt a *de facto* rule that a silent record implies the presence of the public, and therefore only a partial closure. *Longus*, 416 Md. at 452 (plurality opinion) (suggesting that "in some cases, members of the defendant's family or friends may be the only spectators, which would make a 'partial' closure under those circumstances a *de facto* total closure"). We also decline to adopt a *de facto* rule that a silent record implies the absence of the public, and therefore a total closure. Consequently, we hold that this factor is neutral.

### 2. *Conclusion*

In weighing all of the factors above, this Court concludes that the closure in the case *sub judice* was not *de minimus*. We base this conclusion first on the significant amount of time, three to three and one-half hours, that the proceedings were closed to the members of appellant's family. The most important factor, however, is the closure of the courtroom to appellant's family during the selection and swearing-in of the jury. Observation of jury

selection and the swearing-in of the jury by members of the defendant's family (1) instills public confidence in the integrity and fairness of the criminal justice system, (2) ensures the proper use of peremptory challenges by the prosecutor under *Batson*, (3) safeguards a person accused of a crime against the arbitrary exercise of power by a prosecutor or judge, (4) allows the jurors to see that there are interested persons present, (5) permits members of a defendant's family to contribute their knowledge and insight on which jurors to select, and (6) impresses on each juror the importance of the solemn duty that he or she is assuming. Finally, even if we were to assume, *arguendo*, that the closure was a partial closure, the exclusion of appellant's family from the selection and swearing-in of the jury is of such significance that we would still find that the closure was not *de minimus*. Accordingly, unless the closure was justified under *Waller's* four-factor test, appellant's Sixth Amendment right to a public trial was violated.

## B. Was the Closure Justified Under *Waller*?

As stated above, the Supreme Court provided in *Waller* the four-factor test that courts must apply in order to justify the exclusion of the public from any stage of a criminal trial:

> [1] "[T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, [2] the closure must be no broader than necessary to protect that interest, [3] the trial court must consider reasonable alternatives to closing the proceeding, and [4] it must make findings adequate to support the closure."

467 U.S. at 48.

Appellant argues that none of the factors set forth in *Waller* were met in the instant case. As to the first factor, appellant claims that the State did not proffer any "overriding interest that" would have been prejudiced "if [a]ppellant's family were permitted to remain in the courtroom." According to appellant, because there was no overriding interest proffered by the State, by default, the closure was not narrowly tailored to protect such interest. As to the third factor, appellant asserts that this factor was not satisfied, because the circuit court did not consider any alternative to prohibiting appellant's family from entering the courtroom. Lastly, appellant contends that the circuit court did not make any factual findings that supported the exclusion of appellant's family.

This Court need not look any further than the Supreme Court's opinion in *Presley* to hold that the closure in the case *sub judice* was not justified. 558 U.S. at 214-15. In *Presley*, the trial court, *sua sponte*, excluded Presley's uncle from the courtroom at the beginning of *voir dire*. *Id.* at 210. Presley's attorney promptly objected to "the exclusion of the public from the courtroom," and the court ruled that Presley's uncle could watch the proceedings when the trial started. *Id.* After his conviction, Presley presented evidence at a hearing on his motion for a new trial that demonstrated that "14 prospective jurors could have fit in the jury box and the remaining 28 could have fit entirely on one side of the courtroom, leaving adequate room for the public." *Id.* at 210-11. The trial court denied the motion, stating: "It's totally up to my discretion whether or not I want family members in the courtroom to intermingle with the jurors and sit directly behind the jurors where they might overhear some inadvertent comment or conversation." *Id.* at 211. Such ruling was affirmed by both the Court of Appeals and the Supreme Court of Georgia. *Id.*

29

On appeal to the United States Supreme Court, the Court framed the first issue before it as follows: "whether the right to a public trial in criminal cases extends to the jury selection phase of trial, and in particular the *voir dire* of prospective jurors." *Id.* at 212. On this issue, the Supreme Court held that the Sixth Amendment right to a public trial did apply to the jury selection phase, including *voir dire*. *Id.* at 213.

As to whether the trial court in *Presley* complied with the four-factor test set forth in *Waller*, the Court focused on the third factor: "'the trial court must consider reasonable alternatives to closing the proceeding.'" *Id.* at 214 (quoting *Waller*, 467 U.S. at 48). Quoting its language in *Press-Enterprise v. Superior Court of Cal., River Cty*, 464 U.S. 501 (1984), the Court made explicit that a trial court must consider alternatives to closing a courtroom:

> "Even with findings adequate to support closure, the trial court's orders denying access to *voir dire* testimony failed to consider whether alternatives were available to protect the interests of the prospective jurors that the trial court's orders sought to guard. Absent consideration of alternatives to closure, the trial court could not constitutionally close the *voir dire*."

*Id.* (quoting *Press-Enterprise*, 464 U.S. at 511).

Moreover, the Court explained:

> Trial courts are obligated to take every reasonable measure to accommodate public attendance at criminal trials. Nothing in the record shows that the trial court could not have accommodated the public at Presley's trial. Without knowing the precise circumstances, some possibilities include reserving one or more rows for the public; dividing the jury venire panel to reduce courtroom congestion; or instructing prospective jurors not to engage or interact with audience members.

30

*Id.* at 215. Because the trial court in *Presley* failed to consider any alternatives to closing the courtroom, the Supreme Court stated that it did not need to address any other claim of error in the application of the *Waller* four-factor test and held that Presley's Sixth Amendment right to a public trial had been violated. *See id.* at 216.

Like the court in *Presley*, the prosecutor in the instant case had a concern about improper communications between appellant's family and the prospective jurors. The prosecutor failed, however, to proffer any evidence that any such communication occurred, and even if such communication had occurred, the circuit court failed to make any findings to that effect. More importantly, the circuit court, like the trial court in *Presley*, did not consider *any* alternatives to closure. When, during *voir dire*, the State moved to exclude appellant's family from the courtroom, defense counsel observed that "there's clearly space at this point in the courtroom[.]" As suggested by the Supreme Court in *Presley*, the trial court could have allayed the prosecutor's concern by instructing the jurors and appellant's family not to "engage or interact" with each other. *See Presley*, 558 U.S. at 215. Then, at the beginning of jury selection, the court noted that "we have a packed courtroom here," but acknowledged that no one was sitting in the jury box or in the folding chairs in front of the jury box. Assuming that all of the other seats in the courtroom were occupied by prospective jurors, the court could have made space for appellant's family by placing the first twelve jurors in the jury box and having the parties strike from the box.[7] Therefore,

---

[7] Striking from the box is the process by which the parties in a criminal case exercise their respective peremptory challenges, in an alternating fashion, with twelve prospective jurors sitting in the jury box. Usually, the process begins with the first twelve qualified jurors placed in the jury box, which in the instant case would have produced twelve empty

31

in accordance with the teachings of *Presley*, we hold that the exclusion of appellant's family from a portion of the *voir dire* and the entire selection and swearing-in of the jury violated appellant's Sixth Amendment right to a public trial. Accordingly, the judgment of the circuit court must be reversed, and the case remanded for a new trial.

## II. <u>Admissibility of Appellant's Statements</u>

Appellant challenges the trial court's admission of his statements to the police on multiple grounds. Regrettably, we are unable to address all of appellant's challenges, because the record before us is not clear as to exactly which statements appellant wished to suppress. As a result, the circuit court did not make specific findings as to each statement or specific rulings on the admissibility of each statement. Nevertheless, we shall address appellant's claim that his signed waiver of his *Miranda*[8] rights was not knowing and voluntary.

On July 28, 2014, appellant was arrested on an outstanding warrant pertaining to a weapons charge and taken to police headquarters. Detective Massey came to interview appellant, leading to the following conversation:

DETECTIVE [MASSEY]: Okay.

---

seats in the courtroom gallery. Employing a practice that is not inconsistent with the case law and rules of procedure when the Sixth Amendment right to a public trial is not implicated, the trial court here began by calling the first twelve jurors into the well of the courtroom, one-by-one, asking each party if the juror was acceptable, and if accepted by both, placing the juror in the jury box. Once twelve jurors were placed in the jury box, both parties continued to exercise their respective peremptory challenges until the number of challenges was exhausted or the jury was found acceptable.

[8] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Well, let me do this; all right?

[APPELLANT]: (Indiscernible) - -

DETECTIVE [MASSEY]: I have to read you your rights because you have that open warrant, okay?

[APPELLANT]: What is it for?

DETECTIVE [MASSEY]: I think it was a weapon violation.

[APPELLANT]: A weapon violation?

DETECTIVE [MASSEY]: Yeah.

We're going to get a copy of it and I'll bring it in here and let you read it and stuff like that.

But I don't want to talk to you anything about that; all right?

Like I said, I just want to talk to you about [Grubb]; the last time you saw her and you just indicated some - - running around with some guy on FaceBook [sic]. See what you know about that and (indiscernible)

[APPELLANT]: I don't know about nothing. I just –

DETECTIVE [MASSEY]: Okay.

[APPELLANT]: She (indiscernible) that she - - I know she's - - you know.

DETECTIVE [MASSEY]: All right. If you feel that way, I just want the information (indiscernible) - -

[APPELLANT]: But I don't care.

DETECTIVE [MASSEY]: - - (indiscernible) - -

[APPELLANT]: (Indiscernible) - -

DETECTIVE [MASSEY]: I get it. I just want to try to track that down; all right? Since her family reported her missing, we have to look into it; all right?

[APPELLANT]: All right.

DETECTIVE [MASSEY]: So, what I'm going to do is I'm going to go over this Miranda form. Again, I'm not going to talk to you anything about that.

Because you're under arrest, I have to do this.

[APPELLANT]: Yeah.

* * *

[APPELLANT]: But, I mean, I talked - - I talked - - I called [defense counsel] and he told me not to say anything.

DETECTIVE [MASSEY]: Okay. Is that in reference to - - did you know you had a warrant?

[APPELLANT]: No.

DETECTIVE [MASSEY]: Okay. He told you not to say anything about your wife being missing?

[APPELLANT]: About anything. He said; don't talk. He said not to say nothing.

DETECTIVE [MASSEY]: Okay.

What's your address?

[APPELLANT]: 1713 [] Road.

* * *

DETECTIVE [MASSEY]: You gave - - you told them you were going to come back and you were going to talk to us.

[APPELLANT]: Yeah.

34

DETECTIVE [MASSEY]:  Okay.  All right.

With that said, you just told me that your lawyer told you not to say nothing about anything.

**I'm going to read you your rights.  Again, I don't want to talk to you about what you have a warrant for.**

**But you indicated to us that you were coming back to talk to us about [Grubb] being missing.**

[APPELLANT]:  **Right.**

DETECTIVE [MASSEY]:  **All right.  That decision is yours.**

I just have to read you this rights - - these rights, because you have a warrant about something that's totally unrelated and you're in our custody; all right?

**You have to make that decision if you want to talk to me about [Grubb]; all right?**

I just need to - - **we're trying to follow up on the missing person report.  That's all we're trying to do.**

[APPELLANT]:  Oh.

DETECTIVE [MASSEY]:  All right?

[APPELLANT]:  **Well, there's nothing to say.  I don't know anything.**

DETECTIVE [MASSEY]:  **Okay.**

**Well, I just [have] questions to ask you.  If you decide to answer them, you can answer the[m] and, then, we'll go from there; all right?**

**You're the one that indicated to 9-1-1 that you were driving back, at that time, to come up to North Point to talk to us.  That's all I'm saying.  All right?**

35

[APPELLANT]:  Yeah.  I called - - I called (indiscernible)  when I seen my truck on there –

DETECTIVE [MASSEY]:  Uh-huh.

[APPELLANT]:  - - it flipped me out.

DETECTIVE [MASSEY]:  All right.

[APPELLANT]:  Then, I saw the phone number and I called and, you know, I said; yeah.  I'll come up and talk to you.  And I drove all the way back from the ocean and my truck was black.  So, I decided to wash it, you know.

DETECTIVE [MASSEY]:  Okay.

[APPELLANT]:  And, then, I was going to come - - I was going to take the truck home.  I was going to go in and see if she was there and, then, I was going to come over and talk to you.

DETECTIVE [MASSEY]:  Okay.  I understand all that.

You're saying you wanted to - - you wanted to talk to us and, what I'm saying is –

[APPELLANT]:  Because I wasn't rushing over there.  My son was sleeping –

DETECTIVE [MASSEY]:  Yeah, yeah, yeah.

[APPELLANT]: - - in the truck.

DETECTIVE [MASSEY]:  I get that.

[APPELLANT]:  So (indiscernible) - -

DETECTIVE [MASSEY]:  **So, let me go through your rights and, then, we'll talk about all of that, if you decide to; all right?**

Number one, you have the absolute right to remain silent.  Do you understand that?

[APPELLANT]:  Uh-huh.

36

DETECTIVE [MASSEY]:  Yes?  You do?

[APPELLANT]:  Yeah.

DETECTIVE [MASSEY]:  Okay.  What I'm going to have you do is, take this pen and just write "yes" if you understand it.  That's all this is saying.  That I read this to you, number one, you have the absolute right to remain silent.  And you just write "yes" and your initials, just indicating that you understand that right.

(Pause.)

DETECTIVE [MASSEY]:  Number two.  **Anything you say can and will be used against you in a court of law.**

**Do you understand that?**

(Pause.) [The video depicts appellant writing on the *Miranda* form during this pause]

DETECTIVE [MASSEY]:  **Just write in "yes".**

Number three.  You have the right to talk with a lawyer at any time before or during any questioning.

Do you understand that?

[APPELLANT]:  Uh-huh.

(Pause.)

DETECTIVE [MASSEY]:  Okay.

Number four.  If you want a lawyer and cannot afford one, you can request the court to appoint a lawyer prior to any questioning.

You understand that?

[APPELLANT]:  Uh-huh.

* * *

37

DETECTIVE [MASSEY]:  You're writing "yes".

And this says - - this paragraph says; I have read and understand this explanation of my rights.  My decision to waive these rights and to be interviewed is free and voluntary on my part.

(Pause.)

(Emphasis added).

Appellant then signed the *Miranda* form waiving his rights.

At the suppression hearing held on February 19, 2016, defense counsel argued that appellant's statements on July 28, 2014, should be suppressed, because his waiver was not valid.  At the conclusion of the hearing, the circuit court found that "there was no coercion, no threats, no intimidation, no promises made to the [appellant] for him to sign the Miranda rights waiver[.]"  The court further found

> that even with [appellant] being brought in on a weapons charge which is one of the cases we have here, he was told right up front on the first day right at the beginning that the detectives were not interested in the weapons charge as such; but they were interested in information about the missing of . . . Grubb.  And [appellant] just started talking.

Accordingly, the court denied appellant's motion to suppress, impliedly concluding that appellant's *Miranda* waiver was valid.

On appeal, appellant argues that his statements should have been suppressed, because appellant's waiver was invalid.  In support of this contention, appellant claims that, when Detective Massey was giving appellant his *Miranda* warnings, Detective Massey implied that the *Miranda* warnings were only applicable to statements concerning his weapons charge, not statements about Grubb.  Appellant contends that as a result, his

38

waiver was knowing and voluntary as to questions pertaining to the weapons charge, and not knowing and voluntary as to questions concerning Grubb. For guidance on remand, we shall briefly address this argument.

Despite appellant's attempt to frame his argument as one premised on his ability to waive his *Miranda* rights only as to certain questions, the core of his argument is that appellant was not fully informed of the scope of the questioning that would be conducted by Detective Massey, and therefore, his waiver was invalid.[9] This argument has been rejected many times, and we reject it again here.

The Supreme Court has explained:

> **The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege.** The Fifth Amendment's guarantee is both simpler and more fundamental: A defendant may not be compelled to be a witness against himself in any respect. The *Miranda* warnings protect this privilege by ensuring that a suspect knows that he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time. **The *Miranda* warnings ensure that a waiver of these rights is knowing and intelligent by requiring that the suspect be fully advised of this constitutional privilege, including the critical advice that whatever he chooses to say may be used as evidence against him.**
>
> * * *
>
> **This Court's holding in *Miranda* specifically required that the police inform a criminal suspect that he has the right to remain silent and that *anything* he says may be used against him. There**

---

[9] To the extent that appellant's claim is premised on police deception, such argument is not preserved for our review. The argument below was not that appellant was deceived, but that he did not understand his *Miranda* rights. Specifically, defense counsel argued that appellant "did not know whether his rights were being read to him pertaining to the firearms case or the disappearance of [] Grubb."

39

**is no qualification of this broad and explicit warning.** The warning, as formulated in *Miranda*, conveys to a suspect the nature of his constitutional privilege and the consequences of abandoning it. **Accordingly, we hold that a suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege.**

*Colorado v. Spring*, 479 U.S. 564, 574, 577 (1987) (italic emphasis in original) (bold emphasis added); *see also Alston v. State*, 89 Md. App. 178, 184 (1991) ("Officers need not give *Miranda* warnings each time they question the accused about a different subject within the same interrogation session. . . .[W]hether the appellant knew of all of the subjects about which he was to be questioned is irrelevant to the question of whether his *Miranda* waiver was made knowingly, intelligently, and voluntarily.").

Contrary to appellant's argument, the record reflects that Detective Massey did not expressly or impliedly limit the scope of appellant's *Miranda* rights to the weapons charge. Detective Massey repeatedly told appellant that the detectives were not interested in talking to him about the weapons charge; rather they were interested in information about the missing person report on Grubb. Detective Massey also told appellant, at least twice, that the decision to talk about Grubb was his to make, concluding with this statement: "So, let me go through your rights and, then, *we'll talk about all of that, if you decide to; all right?*" (emphasis added). Detective Massey then advised appellant of each of his rights under *Miranda*. He said: "Number one, you have the absolute right to remain silent[;]" "Number two. *Anything* you say can and will be used against you in a court of law[;]" "Number three. You have the right to talk with a lawyer at any time before or during any

40

questioning[;]" and "Number four.  If you want a lawyer and cannot afford one, you can request the court to appoint a lawyer prior to any questioning." (Emphasis added).  There was no qualification to any of these broad and explicit warnings.  *See Spring*, 479 U.S. at 577.  Appellant signed the *Miranda* form indicating that he understood each of the rights and proceeded to speak to Detective Massey.[10]  For these reasons, we hold that appellant's waiver of his *Miranda* rights was knowing and voluntary.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY REVERSED; CASE REMANDED TO THAT COURT FOR A NEW TRIAL. COSTS TO BE PAID BY BALTIMORE COUNTY.**

---

[10] Indeed, the circuit court found that "for the most part [] [appellant] was volunteering information, not in response to questions[.]"